UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
DURHAM DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| Hilton O. Chesson, Jr., | ) | Case No. B-09-81328C-7D |
| | ) | |
| Debtor. | ) | |
| ———————————————— | ) | |
| | ) | |
| Lawyers Title Insurance | ) | |
| Company, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary No. 09-09064 |
| | ) | |
| Hilton O. Chesson, Jr., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

<u>MEMORANDUM OPINION</u>

This adversary proceeding came before the court on July 26, 2012, for trial.  Michael J. Byrne appeared on behalf of the plaintiff and John A. Northen appeared on behalf of the defendant.

NATURE OF PROCEEDING

This is a dischargeability proceeding in which the plaintiff alleges that indebtedness of the defendant is nondischargeable pursuant to section 523(a)(2)(B) of the Bankruptcy Code.  The debt which is alleged to be nondischargeable consists of damages the plaintiff sustained when it paid a claim under a policy of title insurance which the plaintiff alleges it issued in reliance upon a fraudulent affidavit from the defendant.

FACTS

Over the course of his career, the Debtor, Hilton O. Chesson ("Chesson") was a residential and commercial mortgage loan officer for Wachovia for two years; operated his own residential real estate broker business, Chesson Realty, for fourteen years; and worked as an owner in real estate development in five companies that he formed, at various times from 1983-2006, including Trinity Builders, L.L.C. ("Trinity"), a limited liability company owned and managed by Chesson.

In 2003, Trinity became an investor in a residential development project in Garner, North Carolina, known as Parkland Grove ("Project").   The purpose of the Project, which was originally owned by Old Stage Partners, LLC ("Old Stage"), was to prepare the land with basic infrastructure so that it could be subdivided and lots sold to builders.   The Project manager, Avery Bordeaux, contracted Bunn Construction Company, Inc. ("Bunn") to work as the general contractor on the Project.   Old Stage was unable to fully fund the Project and Bunn ceased work and left the Project in June of 2004.   Bunn filed a claim of lien in October of 2004 which was followed by a civil action by Bunn in December of 2004 to enforce the claim of lien.

In February 2005, Trinity acquired a controlling interest in Old Stage and obtained a deed transferring the Project to Trinity. Chesson began to infuse funds into the Project as well as obtaining

funds from investors.  In addition, in February of 2004, Trinity sought and obtained a loan from BB&T in the amount of $975,000 that was evidenced by a promissory note in that amount secured by a deed of trust on the Project.  When the BB&T loan was obtained, Chesson signed a personal guaranty of Trinity's obligations on the BB&T note.  Trinity's plan for repaying the BB&T loan was to complete the development of the Project and pay BB&T from the proceeds realized from the sale of the lots contained in the Project.

Trinity and Bunn then entered into a new development contract for the Project in May 2005.  Based on the failure in 2004 to pay Bunn for its work and Bunn's leaving the Project as a result, Bunn agreed to return to the Project in the summer of 2005 only after Trinity made a substantial prepayment for work.  Despite that prepayment, the Project again began to run out of money, and in August 2005, Bordeaux told Chesson that Bunn was threatening to leave the Project yet again for nonpayment.

In August 2005, Chesson, on behalf of Trinity, made efforts to obtain additional financing from First Horizon Home Loan Corporation ("First Horizon").  That month, Chesson visited the Project site with an officer of First Horizon and observed that work involving bulldozers was actively being done at the Project site.  On or about August 31, 2005, First Horizon issued a loan commitment letter to Trinity.

First Horizon agreed to make two loans to Trinity, in the

- 3 -

amounts of $1,837,500 and $400,000. The larger loan, for $1,837,500, was to be secured by a deed of trust on a parcel called Phase 1A (where the work on the Project was underway), while the smaller loan, for $400,000, was to be secured by a deed of trust on an adjoining parcel called Phase 1B. Chesson understood that as a condition of the $1,837,500 loan, First Horizon required that it would receive a deed of trust as to Phase 1A, and that First Horizon's deed of trust would have priority over any liens or encumbrances on Phase 1A and that Trinity obtain a title insurance policy for each parcel naming First Horizon as an insured.

The closing on the First Horizon loans occurred on September 28, 2005. At the closing, Chesson executed a number of documents on behalf of Trinity as well as a personal guaranty in favor of First Horizon. The loan documents included promissory notes for $1,837,500 and $400,000, together with deeds of trust on Phase 1A and Phase 1B securing the promissory notes. In order to obtain the required title insurance policies, Chesson also executed two affidavits and agreements in his capacity as manager of Trinity, each entitled "Affidavit/Agreement Regarding Liens" ("Affidavits"), for submission to Lawyers Title. At the time of the closing, Chesson was aware that First Horizon required title insurance on the deeds of trust that Trinity would be giving as a condition of the loans, and that the Affidavits were related to obtaining those policies. The property described in one of the

Affidavits is Phase 1A while Phase 1B is described in the other
Affidavit.  Each of the Affidavits is a form affidavit that gives
the applicant the option of checking a box next to the following
headings, as appropriate:

    [ ] FOR CONSTRUCTION RECENTLY COMPLETED:
    . . . .
    [ ] FOR NO RECENT IMPROVEMENTS:
    . . . .
    [ ] FOR CONSTRUCTION LOANS:

In each of the Affidavits that Chesson signed, the box next to
the heading, "[X] FOR NO RECENT IMPROVEMENTS" is selected with an
"X."  In each of the Affidavits, Chesson on behalf of Trinity,
adopted the following statements:

> "[I]n the event that this affidavit is given for the
> purpose of obtaining title insurance on property on which
> there have been no recent improvements, the Owner says
> that there are no pending suits, judgments, executions,
> or encumbrances against the Owner in the State of North
> Carolina or in any Federal Court, except:

> "The Owner swears that they are the Owner of the Property
> hereinafter described, that no improvements or repairs
> have been made on said property during the one hundred
> twenty (120) days immediately preceding this date; that
> there are no outstanding bills incurred for labor
> employed and materials used in making any repairs or
> improvements on said property; and, that there are no
> unpaid bills or liens against said property for sewage,
> street improvements, except:
> . . . .
> "The real estate and improvements referred to herein are
> situated in the County of Wake, State of North Carolina,
> and are described as follows:
> "See Attachment for Legal Description."

No exceptions to the statements set forth in these paragraphs were
noted.

- 5 -

Chesson asserts that he did not read the Affidavits before signing them, other than to note that, in addition to a signature line for the project owner, there was a signature line for the general contractor.

At the time Chesson signed the Affidavit regarding Phase 1A, he knew that Bunn had made improvements upon Phase 1A during the preceding 120 days and, prior to the closing, Chesson had been told by Bordeaux that Bunn was threatening to leave the Project for nonpayment. And, as of September 28, 2005, there were outstanding bills from Bunn for work that Bunn had performed at the Project. An amount invoiced by Bunn on August 31, 2005 totaling $89,325 was not paid by Trinity until October 5, 2005, a week after the closing date on the First Horizon loans. The work that Bunn performed on Phase 1A of the Project in the summer of 2005 included the sewer main work described in Bunn's 8/31/2005 invoice in the amount of $135,042, which was not paid in full until October 5, 2005, and also included the sewer main work described in Bunn's 8/1/2005 invoice in the amount of $84,283.

On or about September 29, 2005, Lawyers Title issued two loan title insurance policies naming First Horizon as an insured, the same being policy numbers RAO21023 and RAO21024 (the "Policies"). Policy number RAO21023 pertained to Phase 1A, while policy number RAO21024 pertained to Phase 1B. Each of the Policies has a policy date of September 29, 2005, at 1:49:50 PM, and provides in part

- 6 -

that, subject to exclusions and exceptions from coverage and conditions and stipulations, Lawyers Title "insures, as of the Date of Policy shown in Schedule A, against loss or damage, not exceeding the Amount of Insurance stated in Schedule A, sustained or incurred by reason of . . . [a]ny defect in or lien or encumbrance on the title;" and also provides that the Policy insures against:

7.   Lack of priority of the lien of the insured mortgage over any statutory lien for services, labor or material:

(a)   arising from an improvement or work related to the land which is contracted for or commenced prior to Date of Policy; or

(b)   arising from an improvement or work related to the land which is contracted for or commenced subsequent to Date of Policy and which is financed in whole or in part by proceeds of the indebtedness secured by the insured mortgage which at Date of Policy the insured has advanced or is obligated to advance.

Policy number RAO21023 has a policy amount of $1,837,500; states that the Name of Insured is "FIRST HORIZON HOME LOAN CORPORATION, Its Successors and/or Assigns as their interests may appear"; and states in part that the "deed of trust and assignments, if any, covered by this policy are described as follows: Deed of Trust executed by Trinity Builders, L.L.C. . . . to Timothy S. Beck, Trustee for First Horizon Home Loan Corporation, dated September 28, 2005 and recorded September 29, 2005 at 1:49:50 PM in Book 11607, Page 509, Wake County Registry, securing $1,837,500.00." This is the deed of trust in favor of First

Horizon covering Phase 1A. Policy number RAO21023 also states, "The land referred to in this policy is described as follows: See attached Exhibit A hereto for Legal Description." The land described in Exhibit A of the Policy includes Phase 1A.

In late 2006, Bunn and its subcontractor, C.C. Mangum Company ("Mangum"), filed liens against the Project, including Phase 1A, for nonpayment. In early 2007, Mangum and Bunn filed lawsuits against Trinity to enforce their mechanics liens and to recover amounts that they were owed and Bunn obtained a judgment against Trinity enforcing its mechanics' lien against property that included Phase 1A of the Project.

Zogreo, L.L.C. ("Zogreo") is the assignee of Bunn's judgment. Zogreo asserts that the value of the Bunn lien totals over $1.3 million. The priority of the Bunn lien relative to other deeds of trust on Parcel 1A, and the obligations, if any, of Lawyers Title to Zogreo under the Title Insurance Policies, was the subject of a lawsuit filed in the Superior Court of Wake County ("State Court Action").

In the State Court Action, Zogreo and a successor company, Forest at Swift Creek, LLC ("Forest"), alleged in their counterclaim against Lawyers Title that they were assignees and successors in interest to First Horizon and are entitled to coverage under the Policies based upon the Bunn lien and judgment and that Lawyers Title breached its contractual obligations to

Zogreo and Forest under the Policies by refusing to provide them with coverage for the Bunn lien. Zogreo and Forest claimed damages for breach of contract including "the amount of the Bunn Judgment, together with attorneys' fees and interest as allowed by law." The judgment in favor of Bunn is in the amount of $895,483.86, with interest at eighteen percent (18%) per annum from September 22, 2006, until the date of entry of that judgment, which was April 29, 2008. The value of the Bunn lien and judgment as of July 10, 2012, was in excess of $1.5 million.

Lawyers Title prevailed in the first phase of the State Court Action by obtaining a ruling that the Bunn lien was junior to certain deeds of trust insured by Lawyers Title other than the First Horizon deeds of trust. The second phase of that litigation consisting of Forest's claims of coverage under the First Horizon Policies, was settled on July 18, 2012, pursuant to a settlement in which Lawyers Title agreed to pay Forest $142,500 to settle Forest's claims in full.

Chesson filed a petition for relief under chapter 7 of the Bankruptcy Code on August 6, 2009. This adversary proceeding was commenced on October 27, 2009. In the complaint, the plaintiff alleges a claim based upon common law fraud on the part of Chesson and a claim for unfair and deceptive trade practices under N.C. Gen. Stat. § 75.1-1.1, etc., ("UDTPA") and alleges that the damages recoverable pursuant to these claims constitute nondischargeable

debts under section 523(2)(B) of the Bankruptcy Code.

DISCUSSION

The validity of a creditor's claim is determined using applicable nonbankruptcy law. Grogan v. Garner, 498 U.S. 279, 283-84 & n.9, 111 S. Ct. 654, 657 (1991). The applicable nonbankruptcy law governing the common law fraud claim and the UDTPA claim in this proceeding is North Carolina law. If a creditor is found to have a valid claim, the claim can be found nondischargeable if the creditor proves that its debt fits within one of the exceptions to discharge. The standards for nondischargeability are governed by federal law. Id. at 284 & n.10, 111 S. Ct. at 658.

A. Fraud

In Myers & Chapman, Inc. v. Thomas G. Evans, Inc., 374 S.E.2d 385, 391-92 (N.C. 1988), reh'g denied, 377 S.E.2d 235 (N.C. 1989), the Supreme Court of North Carolina explained the contours of the common law tort of fraud under North Carolina law. The court listed the five required elements of the tort as: "(1) false representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." Id. at 391. Focusing on the third element, the court explained that intent could not be satisfied by a showing that the defendant possessed a "reckless indifference to the truth." Id. Knowledge of falsity, through either actual knowledge or by

- 10 -

reckless indifference to the truth, and an actual intent to deceive are both necessary to satisfy the intent element. Id. at 391.

In order to prevail in a fraud action, the plaintiff must prove each of the elements of fraud by a preponderance of the evidence. Oliver v. Hecht, 177 S.E. 399, 402 (N.C. 1934). Intent to deceive is one of the more difficult elements to prove in a fraud action since it involves the defendant's state of mind. Because it is nearly impossible to obtain direct proof of a debtor's state of mind, a creditor may present evidence of the surrounding circumstances from which such intent may be inferred. See McLamb v. McLamb, 199 S.E.2d 687, 690 (N.C. App. 1973), cert. denied, 200 S.E.2d 660; see also Caspers v. Van Horne (In re Van Horne), 823 F.2d 1285, 1287 (8th Cir. 1987); Garthe v. Citibank (S.D.), N.A. (In re Garthe), 58 B.R. 62, 64 (Bankr. M.D. Fla. 1986). While the evidence in this proceeding was sufficient to show that Chesson acted with reckless indifference to the truth when he signed the Affidavits without reading them, the evidence was insufficient to show by a preponderance that he had an actual intent to deceive Lawyers Title when he did so. Intent involves the "design, resolve, or determination" with which a person acts. Witters v. U.S., 106 F.2d 316, 319 (D.C. Cir. 1939).[1] There was neither direct nor circumstantial evidence sufficient to show by a

---

[1]Black's Law Dictionary also relies upon this definition of intent. Black's Law Dictionary 810 (6th Ed. 1990).

preponderance that Chesson had the design, resolve or determination to deceive when he signed the Affidavits.  Without such a showing, the evidence was insufficient to establish an intent to deceive as required under the decision of the North Carolina Court in <u>Myers & Chapman</u>.  Lawyers Title therefore is not entitled to prevail on its fraud claim.

### B. UDTPA

To establish liability for a violation of the UDTPA, a plaintiff must prove "1) that the defendant committed an unfair or deceptive act or practice, or an unfair method of competition; (2) in or affecting commerce; (3) which proximately cause[d] actual injury to plaintiff." <u>Furr v. Fonville Morisey Realty, Inc.</u>, 503 S.E.2d 401, 408 (N.C. App. 1998)(citations omitted).

Whether an action is unfair or deceptive depends upon the effect of the relevant practice on commerce. <u>Marshall v. Miller</u>, 276 S.E.2d 397, 403 (N.C. 1981).  To be sufficiently deceptive, a practice need only "ha[ve] the capacity or tendency to deceive; proof of actual deception is not required." <u>Id.</u>  Because this standard is objective, both the intent of the actor and his good faith are irrelevant. <u>Id.</u>  <u>See also</u> <u>Winston Realty Co. v. G.H.G., Inc.</u>, 331 S.E.2d 677, 680 (N.C. 1985); <u>Media Network, Inc. v. Long Haymes Carr, Inc.</u>, 678 S.E.2d 671, 683 (N.C. App. 2009).

For purposes of the second element, commerce is broadly defined as "all business activities, however denominated, but does

not include professional services rendered by a member of a learned profession." N.C. Gen. Stat. § 75-1.1(b). <u>United Labs., Inc. v. Kuykendall</u>, 370 S.E.2d 375, 389 (N.C. 1988).

The third element of actual injury includes "all pecuniary losses sustained ... which are the natural and probable result of the wrongful act and which ... are shown with reasonable certainty by the evidence." <u>Champs Convenience Stores v. United Chem. Co.</u>, 406 S.E.2d 856, 865 (N.C. 1991). Once a court finds a violation of the UDTPA, treble damages must be awarded. <u>Bhatti v. Buckland</u>, 400 S.E.2d 440, 442 (N.C. 1991).

Chesson is liable for a UDTPA violation. The Affidavits that he signed falsely stated that no recent construction had occurred on the Project and that no outstanding bills were owed for improvements to the Project. Unlike the common law fraud claim, Chesson's intent in making these false statements is irrelevant. The Affidavits were executed and submitted to Lawyers Title for the known and intended purpose of obtaining policies of title insurance. To falsely represent in those Affidavits that no recent work had been performed and that there were no outstanding bills clearly had the tendency to deceive and mislead Lawyers Title and, in fact, did so. The execution of the false Affidavits by Chesson was an unfair and deceptive act within the meaning of the UDTPA. The execution and submission of the Affidavits in order to secure title insurance in connection with obtaining a business loan

clearly involved business activity which satisfies the second requirement under the UDTPA. By executing the false Affidavits and inducing Lawyers Title to issue the Policies without any exceptions, Chesson thereby subjected Lawyers Title to the risk of liability for liens and claims that Lawyers Title would not have insured against had it known of the recent improvements and unpaid bills that were outstanding when the Policies were issued and led to the settlement of the State Court Action in which Lawyers Title incurred a loss of $142,500. The settlement constitutes a $142,500 pecuniary loss that was sustained by Lawyers Title as the natural and probable result of Chesson having executed the false Affidavits. Because Chesson is liable under the UDTPA, the damages against him must be trebled to a total of $427,500.

      C. <u>Nondischargeability</u>

In contradistinction to the nonbankruptcy analysis applicable to a creditor's claim, nondischargeability is governed by federal bankruptcy law. <u>Grogan v. Garner</u>, 498 U.S. 279, 284 & n.10, 111 S. Ct. 654, 658 (1991). The determination of nondischargeability is an issue "of federal law independent of the issue of validity of the underlying claim." <u>Id.</u> at 289, 111 S. Ct. at 658. Therefore, even though Chesson is not liable under North Carolina law for common law fraud because Lawyers Title could not establish the element of actual intent, that conclusion does not preclude a nondischargeability action founded upon section 523(a)(2)(B) which

is dependent upon satisfaction of the federal standard for intent to deceive.

In order to satisfy section 523(a)(2)(B) and prove that its debt is nondischargeable, a creditor must prove five elements: (1) "use of a statement in writing," (2) "that [was] materially false," (3) "respecting the debtor's or insider's financial condition," (4) "on which the creditor ... reasonably relied," and (5) "that the debtor caused to be made or published with intent to deceive." 11 U.S.C. § 523(a)(2)(B). The plaintiff must establish each of these elements by a preponderance of the evidence. <u>Garner</u>, 498 U.S. at 287, 111 S. Ct. at 660. As a statutory exception to discharge, section 523(a)(2)(B) should be interpreted narrowly to protect the ability of debtors to obtain a fresh start. <u>Foley & Larder v. Biondo (In re Biondo)</u>, 180 F.3d 126, 130 (4th Cir. 1999).

Lawyers Title has sufficiently proven the first element of section 523(a)(2)(B). In order to satisfy the first element, the statement need not be hand-written. A typed statement executed or otherwise adopted by the debtor that evidences financial condition is sufficient to satisfy the requirement of "a statement in writing." <u>See Insouth Bank v. Michael (In re Michael)</u>, 265 B.R. 593, 598 (Bankr. W.D. Tenn. 2001) (the "writing" requirement of § 523(a)(2)(B) is satisfied by producing a written statement "signed, adopted or used" by the debtor). The statement also need not conform to the typical format of a financial statement. A

defendant's statement concerning whether collateral is encumbered is sufficient to satisfy the first requirement. See Engler v. Van Steinburg, 744 F.2d 1060, 1060-61 (4th Cir. 1984). The Affidavits clearly qualify as statements in writing.

The Affidavits were materially false as required under the second element of section 523(a)(2)(B). A representation is materially false if it portrays a substantially untruthful picture of a financial condition by misrepresenting information of the type which normally would affect the decision to grant credit or insurance. See, e.g., Candland v. Ins. Co. of N. Am. (In re Candland), 90 F.3d 1466, 1470 (9th Cir. 1996); Furio v. Bethpage Fed. Credit Union (In re Furio), 77 F.3d 622, 625 (2d Cir. 1996). The Affidavits were false because they stated that there had been no recent improvements on the Project and that no outstanding bills were due for work on the Project. Furthermore, the Affidavits were materially false. Amanda Jackson, an employee of Lawyers Title, testified that Lawyers Title would have included exceptions in the Policies if the Affidavits had not contained the false statements regarding recent improvement and outstanding bills. Because the false information in the Affidavits was relied upon by Lawyers Title and induced Lawyers Title's to issue the Policies without any exceptions, the false information was material.

To satisfy the third element, the statement must regard either "the debtor's or an insider's financial condition." 11 U.S.C.

- 16 -

§ 523(a)(2)(B)(ii). Even though Chesson executed the Affidavits on behalf of Trinity and the information contained in the Affidavits pertained to Trinity, Trinity's status as an insider brings the Affidavits within section 523(a)(2)(B). When the debtor is an individual, the Bankruptcy Code defines an insider "as a corporation of which the debtor is a director, officer or person in control." Lyndon Prop. Ins. Co. v. Adams (In re Adams), 312 B.R. 576, 582 (Bankr. M.D.N.C. 2004). Since Chesson was the owner and manager of Trinity, Trinity qualifies as an insider. The additional requirement under this element of section 523(a)(2)(B) is that the statement must be "respecting the . . . insider's financial condition. . . ." The Fourth Circuit has adopted a broad view of "financial condition" as used in section 523(a)(2)(B), holding that a debtor's false statement that certain property was owned free and clear of liens was a statement respecting the debtor's financial condition. Engler v. Steinburg (In re Steinburg), 744 F.2d 1060, 1060-61 (4th Cir. 1984). The statements that there had been no recent improvements by Trinity and that Trinity had no outstanding bills are analogous to the statements involved in Steinburg and may be regarded as "respecting" Trinity's "financial condition" for purposes of section 523(a)(2)(B). The Affidavits therefore satisfy the third element under section 523(a)(2)(B).

The reasonable reliance required under the fourth element of

- 17 -

section 523(a)(2)(B) is more stringent than the justifiable reliance standard applied to section 523(a)(2)(A). <u>Field v. Mans</u>, 516 U.S. 59, 66, 116 S. Ct. 437, 442 (1995). Reasonable reliance under section 523(a)(2)(B) requires actual, subjective reliance by the creditor plus the creditor must have exercised the degree of care of a reasonable person involved in that transaction. <u>Colombo Bank v. Sharp (In re Sharp)</u>, 340 Fed. Appx. 899, 908 (4th Cir. 2009). Applicable factors for determining whether the creditor exercised sufficient care include whether it followed its own standard practices, whether the creditor's practices meet or exceed the standard practices of its industry and the circumstances surrounding the transaction. <u>Id.</u> (citing <u>Ins. Co. of N. Am. v. Cohn (In re Cohn)</u>, 54 F.3d 1108, 1117 (3d Cir. 1995)).

The evidence showed that Lawyers Title actually relied upon the false Affidavits. Ms. Jackson explained that Lawyers Title would only insure the priority of security interests on real property if affidavits and any required lien waivers were completed. Ms. Jackson further explained that exceptions would have been included in the Policies had Chesson noted the recent work or the outstanding bills. The evidence established that Lawyers Title actually relied upon Chesson's false representation there had been no recent improvements and that there were no outstanding bills in issuing the Policies without exceptions.

The evidence also showed that the reliance of Lawyers Title

upon the false Affidavits in issuing the Policies was reasonable. The standard practice of Lawyers Title was to analyze the contents of affidavits submitted in support of applications for insurance coverage and to act on the basis of the information contained in the affidavits.   Because the second box for "No Recent Improvements" was checked on the Affidavits, it was unnecessary for a contractor or subcontractor to sign the affidavit or lien waivers nor was there any reason for Lawyers Title to have inquired further or investigated into the existence of recent construction or outstanding bills.   Although an on-site investigation could have revealed the recent construction on the Project, conducting such an investigation before issuing the Policies would have been impractical for Lawyers Title, is not a standard practice in the industry and was not required in this case.   See Lyndon Prop. Ins. Co. v. Adams (In re Adams), 312 B.R. 576, 585 (Bankr. M.D.N.C. 2004); Lawyers Title Ins. Corp. v. Pitt, 157 B.R. 585, 589 (E.D. Va. 1991).   In short, given the absence of any "red flags" indicating that the incorrect box had been checked, Lawyers Title's reliance upon the Affidavits was reasonable and within the standards of Lawyers Title as well as industry standards.

Lastly, Lawyers Title was required to prove that Chesson made or published the false statements in the Affidavits with intent to deceive.   Chesson knew that recent construction had occurred on the Project and that there were outstanding bills on the project when

- 19 -

he executed the Affidavits.  Chesson had toured the Project with the officer of First Horizon shortly before the closing of the First Horizon Loan on September 28 and had witnessed that work was underway on the Project.  Chesson also was aware of the outstanding bills owed to Bunn at the time of the closing of the First Horizon Loan.  The critical question is whether there was an intent to deceive for purposes of determining the dischargeability of his obligation to Lawyers Title.  This inquiry, as previously noted, poses a question that must be answered under federal law.  Unlike the intent element of common law fraud under North Carolina law, the intent element of section 523(a)(2)(B) can be satisfied when a a statement that is false is made with reckless indifference to whether such statement is true.  See Foote v. Albanese (In re Albanese), 96 B.R. 376, 379-80 (Bankr. M.D. Fla. 1989) (citing Morimura, Arai & Co. v. Taback, 279 U.S. 24, 33, 49 S. Ct. 212, 215, 73 L. Ed. 586 (1979)).  A number of courts have determined that the intent element of section 523(a)(2)(B) can be satisfied by a defendant's reckless act of signing a document containing false statements without reading the document.  Home Loan Corp. v. Hall (In re Hall), 342 B.R. 653, 656-57 (Bankr. M.D. Fla. 2006); Foote v. Albanese (In re Albanese), 96 B.R. 376, 380 (Bankr. M.D. Fla. 1989); Long Island Trust Co. v. Rodriguez (In re Rodriguez), 29 B.R. 537, 541 (Bankr. E.D.N.Y. 1983); Teachers Serv. Org. v. Anderson (In re Anderson), 10 B.R. 607, 608 (Bankr. S.D. Fla.

1981).  In the <u>Teachers Service</u> case, the defendant signed a financial statement listing his outstanding debts, assets and income.  10 B.R. at 608.  The statement did not list a number of the defendant's liabilities.  <u>Id.</u>  The defendant alleged he had not read the financial statement and therefore, did not have the necessary intent.  <u>Id.</u>  The court disagreed and found that the failure to read the statement prior to signing it was sufficiently reckless as to the truth or falsity of the statement so as to satisfy the intent element of section 523(a)(2)(B).  The court believes that these decisions are sound and should be followed in this proceeding.  The court concludes that under the circumstances of this proceeding, Chesson acted with reckless indifference to the trust when he executed the Affidavits without reading them.  The transaction involving the Affidavits was a very substantial business transaction involving loans totaling over $2,000,000 and warranted a high degree of care and concern for accuracy and truthfulness.  Chesson was an educated and experienced businessman who had been involved in many previous transactions involving loans that were to be secured by deeds of trust on real estate.  Chesson had a general understanding of the nature and purpose of title insurance and understood that title insurance was required in order for Trinity to obtain the loans from First Horizon, that the Affidavits would lead to the issuance of the title insurance policies and that the amount of the title insurance would be

comparable to $2,000,000 of loans.  His experience with the attorney who prepared the loan documents and Affidavits was of recent origin and there was no evidence that Chesson did not read the Affidavits because of heavy reliance upon his relationship with the attorney or because the attorney was a trusted adviser of long standing.  Although Chesson described the closing as having been concluded in a short period of time, there was no credible evidence of any circumstances that prevented Chesson from reading the Affidavits or asking questions regarding the Affidavits or any other aspect of the closing.  Under these circumstances, Chesson's signing the Affidavits without reading them or making any inquiry exhibited a gross indifference to whether the Affidavits were truthful which is sufficiently egregious to satisfy the intent to deceive element required under section 523(a)(2)(B).  Chesson's criticism of the attorney for including the false statements in the Affidavits neither explains nor justifies Chesson's reckless conduct in signing the Affidavits without reading them.  The fact remains that Chesson could and should have read the Affidavits but on his own, chose not to do so.  The consequences of this reckless decision may not be avoided by blaming the attorney who prepared the documents.  See Lawyers Title Ins. Corp. v. Pitt, 157 B.R. 585, 590 (E.D. Va. 1991) (attorney's inclusion of incorrect information in affidavits signed by debtor did not relieve debtor of liability in dischargeability proceeding).

Based upon the foregoing, the court concludes that the amount of Chesson's liability to Lawyers Title constitutes a debt that is nondischargeable pursuant to section 523(a)(2)(B) of the Bankruptcy Code.   The amount of such liability includes the treble damages required under the UDTPA.   See Cohen v. De La Cruz, 523 U.S. 213, 223, 118 S. Ct. 1212, 1219 (1998) (holding that the nondischargeability of a liability pursuant to section 523(a)(2)(A) encompasses any liability including, treble damages, "arising from money, property, etc., that is fraudulently obtained").   Accordingly, a nondischargeability judgment against Chesson in the amount of $147,500 shall be entered contemporaneously with the filing of this memorandum opinion.

This 9th day of October, 2012.

WILLIAM L. STOCKS
United States Bankruptcy Judge

- 23 -

PARTIES IN INTEREST

Hilton O. Chesson
18 Trappers Court
Durham, NC 27712

Michael J. Byrne, Esq.
P.O. Box 13706
Research Triangle Park, NC 27709

John A. Northen, Esq.
P.O. Box 2208
Chapel Hill, NC 27514-2208